Williams *v.* Allen.

---

ELIAS S. WILLIAMS and others

*v.*

THOMAS E. ALLEN and others.

A statute was passed in 1868, authorizing certain owners of swamp and low lands to elect three persons, styled managers, who were to estimate the cost of draining such lands, including the deepening of natural water-courses, the purchase of a designated mill property, and

the removal of the dam thereon, and surveys and any other inciden-tal, legitimate expenses, and to assess the amount on the several land owners, according to the benefits received. The managers made the estimates, purchased the mill property, and carried out the act so far as they could, until interrupted by an injunction, and afterwards, in 1870, the statute was repealed, saving all rights. Some of the land owners had paid their assessments, the validity of those of others had been established at law, but the managers' successors refused to pro-ceed.—*Held*, that the unpaid assessments were, under the circum-stances, enforceable in equity, and that the original managers could come into equity for an accounting of the sums expended and received by them, and to be re-imbursed for any excess of the former on the latter from the assessments of the delinquent land owners, and the enforcement thereof against their lands.

Bill for relief. On general demurrer.

*Mr. B. Williamson,* for the demurrer.

*Mr. H. C. Pitney,* for complainants.

THE CHANCELLOR.

The bill is filed to enforce the lien of certain assessments made by Elias R. Williams, Elijah P. Oliver and Joseph Blake (the last two are both now deceased), under the act entitled "An act to enable the owners of swamps and marshy lands lying on the upper Passaic, and its tributaries, in the counties of Morris and Somerset, to drain the same," approved April 21st, 1868.

Under the act, those persons were duly elected managers, on the 1st day of June, 1868, and three days afterwards they took the oath of office, and subsequently duly entered on the discharge of their duties. The act made it their duty, as soon as practicable after being notified of their election and taking the oath, to ascertain, in such manner as they might judge most effectual and advisable, what quantity of land in the townships of Passaic and Chatham, in the county of Morris, and Bernards, in the county of Somerset, which were then wet and marshy, and needed to be drained, could,

Williams *v.* Allen.

in their judgment, be effectually drained by the removal of the obstructions, either natural or artificial, which existed in the Passaic river between Osborn's mill-dam and Davidson's bridge, or in the tributaries which emptied into the river between those points, or by widening, deepening or straightening the channel of the river and those tributaries, and to have a map or maps of that land prepared, showing the names of the different owners thereof, and the quantity owned by each, so far as they could ascertain; a copy of which map or maps was to be filed by them, as soon as completed, in the office of the clerk of each of the counties of Morris and Somerset, there to remain as a public record; and for those purposes they were authorized to employ one or more competent surveyors or engineers, and such other assistants and agents as they might think necessary.

The act further provided, that it should be the duty of the managers, as soon as the surveys and maps should have been made and filed, to make an estimate, according to their best judgment, of the cost of removing the obstructions in the river and its tributaries, and of widening, deepening and straightening the channels thereof, if such straightening, widening and deepening should, in their opinion, be required; and that, having made such estimate, they should at once, and before commencing to remove the obstructions, assess the amount thereof, together with the amount expended in making the surveys and maps, and a sufficient additional amount to pay for their own services, and the actual cost of procuring the law, not to exceed $300, upon the owners of the land included in their surveys, according to their judgment of the benefit which would accrue to each of those owners by the draining of the lands, and should give them, where they could be found in this state, notice thereof in writing, and require payment within one month from the time of giving notice. Copies of the assessment were to be filed, also, in the offices of the clerks of the counties of Morris and Somerset, and the act provided that the assessments should be a lien upon the lands

Williams *v.* Allen.

until paid or discharged by due process of law. It further provided, that whenever the managers should require any money to pay the expenses incident to their trust, or to pay any award made in pursuance of the act, and the money should not be in hand, they should, from time to time, as required, make an assessment on the owners of the lands embraced in their surveys and maps, in proportion to the quantity of land owned by each, and the benefit which, in their judgment, each would receive, and should give to such owners notice of such assessments, in writing, and should also file in the offices of the clerks of the counties of Morris and Somerset copies of those assessments, which should remain a lien on the property of such owner until paid or otherwise discharged by due course of law, and that if any such assessment should remain unpaid for thirty days after such notice, the managers should, by notice signed by them, and set up at five public places in the township where the land might lie, and by publishing it in a newspaper published in the county, for at least four weeks prior to the day of sale, advertise the lands for sale at such place as they might direct, and at the time and place appointed should publicly sell the lands of the persons so assessed which might be included in their survey and maps, for the shortest term for which any person would agree to take the same, in consideration of the payment of the assessments, with interest and costs.

The act authorized the managers to negotiate with the owner or owners of the property known as (according to the language of the act) the Dennis mill property, consisting of about fourteen acres of land, and the water-power, mills and other buildings thereon, for the purchase thereof, and, in case they could agree with the owner or owners of that property, to buy it and pay for it out of money raised by assessments; and they were also empowered to sell at public or private sale and convey any of the land or buildings of that property which might not be needed for the purposes of the act.

Williams *v.* Allen.

After they were elected and had taken their oath of office, the managers entered on the discharge of the duties of their office, and, according to the directions of the act, proceeded to ascertain what land could, in their judgment, be effectually drained by the removal of the obstructions referred to in the act, and by the removal of the dam on the mill property before mentioned, and caused a map and survey of those lands to be made and filed according to the directions of the law. On filing the map and survey, they made an estimate (November 21st, 1868), according to the directions of the act, of the cost of removing the obstructions in the river and its tributaries, and of widening, deepening and straightening the channels thereof, and of the cost of the maps and survey, and a sufficient amount to pay for their own services and the actual cost of procuring the act (not exceeding the limit fixed, $300), and to purchase the mill property. The amount of the estimate was $22,684.27, and they assessed it upon the owners of the lands included in their surveys, according to their judgment of the benefit to accrue to them by the draining of their lands included in the surveys, and not exceeding those benefits.

The assessment was duly filed and notice of it given to all the owners, requiring payment according to the directions of the act. In making up the estimate, the managers considered and calculated that it would require $17,000 to buy the mill property, and that, after removing the dam thereon, they could sell it for $7,000, so that the cost of getting rid of the dam would be $10,000; that it would require $10,000 to widen, straighten and deepen the ditches in the swamp and remove obstructions therefrom, and that the balance, $2,684.26, of the amount of the estimate would be required to meet the expenses of making the maps and surveys, counsel fees, legal charges, cost of procuring the act, compensation of the managers and incidental charges and expenses. The managers, acting on their judgment and the instructions of the meeting of the land owners at

which they were elected, at once set about buying the mill property (it was Dunn's mill property, but, by mistake, called Dennis's in the act), and, on the 2d of July, 1868, entered into a written contract with the owners for the purchase thereof, at $17,000 (the lowest price at which it could be bought), payable in cash, January 1st, 1869, and they and the owners bound themselves to each other in the sum of $3,000 liquidated damages, to fulfill their contract. The purchase, though made by the managers in their own name, was made in their official capacity and under the act.

December 26th, 1868, the defendants in this suit filed a bill in this court against the managers, to restrain them from taking any proceedings for the purchase of the mill property, and from entering into, or carrying into effect, any contract concerning it, and from applying any funds raised by them to the purchase of the property. The grounds on which the claim to relief was based, were that the act gave no authority to buy the Dunn's mill property, and that the removal of the dam of that property was in nowise necessary for the purposes of the act.

The injunction was granted and was served on the managers, December 29th, 1868. They, being bound under the contract to complete the purchase of the property within three days from the time when the injunction was served, paid for the property with their own funds, and caused the conveyance to be made to Daniel D. Craig, as their trustee. They answered the bill, and a motion was made in their behalf to dissolve the injunction, May 27th, 1869, and it was then stipulated, by and between the solicitors of the parties, that if the court should decide that the act granted power to the managers to buy the Dunn's mill property for the purposes of the act, the injunction should be dissolved, so far as it restrained the managers from purchasing that property, or paying for it out of the moneys raised by assessment, and that an order should be made by consent that the managers should hold the property in trust, to be disposed of by them or their successors, under the provi-

sions of the act, but that it should not be injured nor the
dam removed until the further direction of the court.

On the 16th of June, 1869, the injunction was, after con-
sideration, dissolved (*Lindsley* v. *Williams, 5 C. E. Gr. 95*),
and it was ordered, by the chancellor, that the managers
should hold the property in trust for the purposes of the
act, and it was also ordered that they should refrain from
abating the dam or injuring the property until the further
order of this court.

It was admitted, for the purposes of the motion, that the
abatement of the dam was necessary and proper for the
purposes of the act.   On the 7th of June, 1869, the man-
agers, at the annual meeting of the land owners, reported
that they had paid out, in the purchase of the mill prop-
erty, $17,000, and, for actual necessary expenses in carry-
ing into effect the purposes of the act, $2,572.07 (altogether
$19,572.07), and had collected on the assessment $5,455.76,
and had received for rent of the mill property $291.81,
leaving a balance due them of $13,824.51, besides interest.
After making that report, they collected $6,500, part from
purchasers of the mill property to whom they sold it, for
purchase-money, and the rest for insurance on a barn
thereon destroyed by fire; and they paid out, for actual
and necessary expenses in the performance of their trust,
the further sum of $872.84, and there is now in arrear and
owing to the complainants in this suit, for advances made
by the managers, over and above their receipts and interest,
more than $10,000, for which they claim to be entitled to
the benefit of a lien on the lands of the defendants men-
tioned in the bill, for the amount of the assessments levied
but not paid.

At the annual meeting of June, 1869, other persons were
elected managers in place of the first managers.   The per-
sons so elected were elected as persons opposed to the
collection of the assessments.   Four of the persons who
had paid their assessments requested the managers, by
written communication, dated June 14th, 1869, to carry

out the purposes of the act, and collect the unpaid assessments and devote the money to the purposes of the act, and all the land owners (about fifty in number) who had paid their assessments, claimed and insisted that they should receive the benefit of their payments by the abatement of the dam, and that the unpaid assessments should be collected and devoted to the purposes of the act. The new managers, however, refused to proceed to do anything under the law.

During the pendency of the suit in this court, before referred to, twenty-six of the land owners who had paid their assessments, by written agreement, requested the old managers to proceed to procure the dissolution of the injunction, and the removal of the dam as soon as practicable, and, after the removal of the dam, to sell the mill property at the best price they could get, subject to such restriction as would forever prevent the erection thereon, without the consent of each of the land owners signing the agreement, or their assigns, of any obstruction to the flow of the Passaic river; and they requested the old managers to proceed to collect the unpaid assessments, and agreed to indemnify them in case they should be unable to obtain re-imbursement in that way. Upon the old managers proceeding to obtain a dissolution of the injunction, and to that end to dispose of the question whether the removal of the dam was necessary to aid in the drainage, the complainants in that suit voluntarily dismissed their bill, with costs.

In August, 1869, the old managers removed the dam, and afterwards sold and conveyed the mill property, subject to the restriction that the grantees, their heirs or assigns, should never erect, place, suffer or permit to be erected or placed or to remain on the premises conveyed to them respectively, any obstruction to the free, unimpeded and natural flow of the waters of the Passaic in their then present course across the property. In March, 1870, the act was repealed, excepting and reserving, however, all property, rights, privileges, matters and things, liabilities and agreements or responsibilities

legally acquired, incurred, assumed, performed or made under or by virtue of the act. *P. L. 1870 p. 602.*

The old managers, in order to re-imburse themselves for their outlay before mentioned, proceeded to collect the unpaid assessments by proceedings under the act, and advertised the lands of certain of the defendants for sale accordingly; the sale to take place September 13th, 1869. The proceedings were then removed by *certiorari* into the supreme court, and the validity of the assessments, and the liability of the lands therefor, was established there. *State, Brittin pros.* v. *Blake, 6 Vr. 208.* And, on error, the judgment was affirmed. *State, Brittin pros.* v. *Blake, 7 Vr. 442.* It was held, however, that the old managers, being out of office, could not collect the assessments by legal proceedings, but that the managers for the time being could.

The validity of the assessments, then, is established. The act has been repealed, saving the lawful rights and liabilities created under or by virtue of it. The managers, whose duty it was and is to collect the assessments, refuse to discharge that function. No further proceedings for drainage can be taken under the act, in consequence of the repeal. The assessments are for an amount which was supposed to be sufficient to do the whole work. It included $10,000 for deepening, widening and straightening the ditches and removing obstructions therefrom, and another sum ($2,684.26) was intended to cover, besides the cost of maps and surveys, the compensation of managers, counsel fees and incidental charges and expenses. No part of the work contemplated has been done, except that which was preparatory, and the purchase of the mill property, and the removal of the dam. It would be manifestly unjust to raise, by proceedings at law, the whole of the assessment, for a very considerable part of the work for which it was laid will not be done, the legislative authority for it having been revoked. The remedy by *mandamus* would, therefore, be inequitable and unjust.

Williams *v.* Allen.

There should be an account to ascertain the amount which ought, under the circumstances, to be raised by assessment, and the proceedings to collect should be confined to that. Therefore, equity is the proper forum. It furnishes the appropriate remedy. It has jurisdiction. *Story's Eq. Jur.* § *506.*

The bill is filed against the persons who have failed or refused to pay the assessments, and its object is to secure for Williams and the estates of his late associates, re-imbursement for the moneys lawfully paid, by them in the course of the discharge of their duty, and on the faith of the assessments. It prays that it may be decreed that each and every of the lots of land described therein, is charged and encumbered with, and subject to the lien and encumbrance of, the assessment, with interest, and that the owners may be required to pay the assessment, or so much as may be necessary to repay to the complainants the money advanced by the old managers out of their individual property to buy the mill property, and to carry into effect the purposes of the act, with interest, and that, in default, their land, subject to the assessment, may be sold to raise the money; and it prays relief generally. The defendants, according to the bill, have had the advantage of the proceedings and transactions in which the expenditures, for which re-imbursement is sought, were made. It is eminently just, on the statements of the bill, that they should pay them as the legislature intended, and as fair dealing obviously would require.

The demurrer will be overruled.